**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                  **09-CR-401S(Sr)**

**MICHAEL WAYNE FINCH,**

        **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.  Dkt. Entry dated December 17, 2009.

## PRELIMINARY STATEMENT

        The defendant, Michael Wayne Finch, is charged in a two-count Indictment with having violated Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) (Counts 1 and 2).  Dkt. #6.  The defendant also faces forfeiture of firearms and ammunition pursuant to Title 18, United States Code, Sections 924(d) and 3665, and Title 28, United States Code, Section 2461(c).  *Id.*  Presently pending before this Court is the defendant's motion to suppress physical evidence and statements made by him to law enforcement.  Dkt. #11.

**<u>FACTS</u>**[1]

On September 21, 2009, a Concerned Citizen contacted the New York State Police and advised that someone known to the Concerned Citizen as "Michael," a white male in his fifties, an owner/operator of a white, Dodge conversion van bearing New York State registration EVN 2005, was offering two handguns for sale. Dkt. #12, pp.1-2. In addition, the Concerned Citizen advised the New York State Police that "Michael" was living and sleeping in his van behind 5889 Ward Road, Apt. #2 in Sanborn, New York and that the apartment was rented by Ben Askey. *Id*. at p.2.

Thereafter, on September 21, 2009, New York State Police Investigator John DiPasquale checked the records for the New York State Department of Motor Vehicles and for New York Registration EVN 2005 and learned that the vehicle was identified as a 1990 Dodge white suburban van and was registered to Michael Wayne Finch, date of birth October 17, 1951, with the address of 5889 Ward Road, Apt. #2, Sanborn, New York. *Id*. The following day, September 22, 2009, Investigator DiPasquale checked with the Niagara County Pistol Permit Bureau and learned that Michael Wayne Finch did not possess a New York State Pistol Permit. *Id*

On September 30, 2009, Investigator DiPasquale further interviewed the Concerned Citizen who stated that he/she had previously observed the defendant in

---

[1] The facts herein are taken from the Affirmation of Kimberly A. Schechter submitted in support of defendant's motion to suppress (Dkt. #11) and the Government's Response to Defendant's Pre-Trial Motions filed March 16, 2010 (Dkt. #12).

possession of two handguns, further described as a .45 caliber revolver and a .45 caliber semi-automatic pistol.  *Id*.  Moreover, the Concerned Citizen advised that the defendant had told him/her that he had sold one of the .45 caliber handguns.  *Id*.

Several weeks later, on or about November 19, 2009, the Concerned Citizen contacted Investigator DiPasquale and advised Investigator DiPasquale that the defendant was preparing to leave New York State to travel to South Carolina, however, the defendant remained interested in selling some of his handguns.  *Id*. at p.3.  More specifically, the Concerned Citizen stated that on November 16, 2009, the defendant had shown him/her the handguns.  *Id*.  The Concerned Citizen was able to describe the handguns in greater detail and further stated that all of the handguns were kept inside the defendant's 1990 Dodge conversion van.  *Id*.

On November 19, 2009, New York State Police Investigator John DiPasquale, by way of affidavit, applied to the Honorable Hugh C. Gee for a search warrant to search a "A White Dodge Conversion Van, having Vehicle Identification Number 2B6HB21Y2LK781883, which is registered with the New York State Department of Motor Vehicles to a Michael W. Finch, and bears New York Registration Plate EVN 2005.  To include any Attached Trailer or other Cargo Type Equipment Present with the Vehicle."  At the time he applied for the search warrant, Investigator DiPasquale was accompanied by a "Concerned Citizen" to the Lewiston Town Court. The Concerned Citizen appeared *in camera* before Judge Gee, was sworn and, in

response to questions posed by Judge Gee, provided information in support of the application for the search warrant. Dkt. #18, ¶ 3. Prior to his appearance with the Concerned Citizen before Judge Gee, Investigator DiPasquale had notified other New York State Troopers to conduct surveillance of the conversion van while he was in the process of obtaining the search warrant. Dkt. #12, p.3.

At approximately 12:30 p.m., Investigator DiPasquale received a communication from New York State Trooper Joseph Raimondi that the defendant was leaving 5889 Ward Road in his conversion van. Dkt. #12, p.3. At the time, Investigator DiPasquale informed Trooper Raimondi that he was in the process of obtaining a search warrant for the vehicle and requested that Trooper Raimondi stop and detain the vehicle until Investigator DiPasquale could obtain the search warrant. *Id*. at p.4. As Trooper Raimondi approached the vehicle on Route 31 in the Town of Lewiston, New York, he observed the van pulling a trailer and the trailer appeared to have a partially obscured Michigan license plate on it. *Id*.

At 12:32 p.m. on November 19, 2009, Trooper Raimondi initiated a traffic stop of the vehicle and the attached trailer. *Id*. Thereafter, Trooper Raimondi issued the defendant a traffic citation for a violation of the New York State Vehicle and Traffic Law Section 402(1)(b), which provides in part, "numbered plates shall be kept clean and in a condition so as to be easily readable and shall not be covered by any glass or any plastic material . . . " N.Y. Veh. & Traf. Law § 402(1)(b) (McKinney 2010). At 12:40 p.m., Investigator DiPasquale entered Judge Gee's chambers for the purpose of

presenting the above-referenced application for a warrant to search the defendant's vehicle. *Id*. Since Investigator DiPasquale had just been informed by Trooper Raimondi that the vehicle was towing a trailer, the application for a search warrant and the search warrant were amended to include the language, "any attached trailer or other cargo type equipment present with the vehicle." *Id*. at pp.4-5.

Shortly thereafter, at approximately 12:50 p.m., Judge Gee authorized the search warrant for the defendant's vehicle and trailer and Investigator DiPasquale immediately notified the troopers at the scene of the vehicle and traffic stop that they had obtained the search warrant and that he was en route to the scene to begin the execution of the search warrant. *Id*. at p.5.

At approximately 12:40 p.m., the defendant spontaneously stated to Trooper Raimondi, "I have three guns and five knifes [sic]. They're all legal, you can search the trailer, but I [sic] rather you not search my van. That is like my home. I have nothing else to hide. I told you everything is legal." *Id*. According to the government, this statement was not in response to any questioning of the defendant by law enforcement officers. *Id*. Notably, although the defendant disagrees with the government's claim that the defendant's statement was spontaneous and not in response to any questioning, the defendant does not elaborate as to what question or questions the defendant's statement was in response to, except to say, "the Defense does not agree that Mr. Finch's statements to Trooper Raimondi relating to guns and knives in his van were made spontaneously, as is alleged in the Government's

Response."  Dkt. #13, pp.1-2.  The defendant does, however, state without elaboration, "at the time he made those statements, Mr. Finch had asked to be able to leave the patrol car, but was refused permission.  Moreover, . . . at the time the statements were made, the officers were trying to get Mr. Finch to consent to a search of his van and therefore, their questions were a deliberate attempt to provoke incriminating responses."  *Id*. at p.2.

After Investigator DiPasquale transported the Concerned Citizen back to his/her residence, Investigator DiPasquale arrived at the scene and with other law enforcement officers, began the search of the van and the trailer.  Dkt. #12, p.5.  At approximately 3:00 p.m., Investigator DiPasquale questioned the defendant, who, at that time was not under arrest, but rather was being "detained" pending the search of the vehicle.  *Id*.  As excerpted in the government's opposition to the defendant's motion to suppress, the conversation between Investigator DiPasquale and the defendant was as follows:

> Question:  How come your Michigan driver's license has the wrong date of birth?
>
> Answer:  Like I told the officer, there was some kind of mistake and when I brought it to their attention, they told me not to worry about it.
>
> Question:  What is your real date of birth?
>
> Answer:  10/27/51, it's off by ten days, it should be a one and not a two [sic].
>
> Question:  Are you going to tell me what kind of guns you have inside the van?

Answer:  I never said I had guns.  I told him that I have three knives, actually, two bayonets and a knife.  You guys are violating my rights.  Nobody read me my <u>Miranda</u> or anything.

Question:  You are not under arrest, however, you are in my custody and since you have brought the matter, up, I will read you your <u>Miranda</u>.

Answer:  Don't bother, I already know them and I waive my rights.  I'm not trying to cause a problem.

Dkt. #12, p.6.

Approximately forty-five minutes later, after several firearms and ammunition were discovered in defendant's van and/or trailer, Investigator DiPasquale again spoke with the defendant as follows:

Question:  Where did you get the .22 revolver from?

Answer:  I got that as a gift from a guy I know from Lake Katheryn Village, Washington.  His name is Jim Scott.  I traded him a dog for it.  Actually, it was a pregnant dog, same as mine.

Question:  Possession of that gun in New York State without a pistol permit is a crime and since you do not have a pistol permit, you are now under arrest.

*Id*. at pp.6-7.  At that time, Investigator DiPasquale placed the defendant under arrest.

*Id*. at p.7.

Following the execution of the search warrant, the defendant was initially charged in a criminal complaint (Dkt. #1) and was later indicted by a Federal Grand Jury sitting in the Western District of New York (Dkt. #6).  Consistent with this Court's First Amended Scheduling Order (Dkt. #9), the defendant filed his motion to suppress

on February 26, 2010 (Dkt. #11). The government filed its response to the defendant's motion to suppress on March 16, 2010 (Dkt. #12) and thereafter, the defendant filed a reply in further support of his motion on March 22, 2010 (Dkt. #13). Oral argument on defendant's motion to suppress was held on March 25, 2010. During the March 25, 2010 oral argument, it was determined that the Court should review any audio tape recording, any transcript and any handwritten notes concerning the search warrant application and any *in camera* testimony before Judge Gee. Dkt. #14-2, ¶ 6.

Consistent with this Court's Order (Dkt. #15), on or about April 15, 2010, the undersigned received a letter from the Town of Lewiston Court Clerk enclosing a sealed envelope containing the handwritten notes of Judge Gee. During an April 30, 2010 status conference concerning the handwritten notes, the Court gave counsel for the government an opportunity to review Judge Gee's handwritten notes and noted that there was nothing on the face of the handwritten notes that revealed the name of the Concerned Citizen or set forth any other personally identifying information. Thereafter, the Court provided the government with the opportunity to confer with Investigator DiPasquale as to whether there was anything in Judge Gee's handwritten notes that was so singular so as to effectively identify the Concerned Citizen, notwithstanding the fact that the handwritten notes did not contain a name or other personally identifying information. On May 3, 2010, counsel for the government advised the Court that it objected to the disclosure of Judge Gee's handwritten notes; the government filed a motion seeking the non-disclosure of the handwritten notes on May 20, 2010 (Dkt. #18).

This Court's Decision and Order with respect to the government's motion seeking the non-disclosure of Judge Gee's notes, was filed on July 30, 2010. Dkt. #22.

By the instant motion, the defendant seeks the suppression of the evidence seized from the defendant's van and trailer because the initial stop of the vehicle was improper, the defendant's detention was excessive, and the search warrant was not supported by probable cause. In addition, the defendant seeks the suppression of his statements to law enforcement because his statements were made in response to law enforcement interrogation and were made before the defendant was read his *Miranda* warnings.

## DISCUSSION AND ANALYSIS

### The Stop of Defendant's Vehicle

As described above, on November 19, 2009, based on information received from a Concerned Citizen on September 21, 2009, September 30, 2009 and on November 19, 2009, Investigator DiPasquale, by way of affidavit, applied to the Honorable Hugh C. Gee for a warrant to search a "A White Dodge Conversion Van, having Vehicle Identification Number 2B6HB21Y2LK781883, which is registered with the New York State Department of Motor Vehicles to a Michael W. Finch, and bears New York Registration Plate EVN 2005. To include any Attached Trailer or other Cargo Type Equipment Present with the Vehicle." At the time he applied for the search warrant, Investigator DiPasquale was accompanied by a "Concerned Citizen" to the Lewiston Town Court. Prior to his appearance with the Concerned Citizen before

Judge Gee, Investigator DiPasquale had notified other New York State Troopers to conduct surveillance of the conversion van while he was in the process of obtaining the search warrant. Dkt. #12, p.3.

At approximately 12:30 p.m., Investigator DiPasquale received a communication from New York State Trooper Joseph Raimondi that the defendant was leaving 5889 Ward Road in his conversion van. Dkt. #12, p.3. At the time, Investigator DiPasquale informed Trooper Raimondi that he was in the process of obtaining a search warrant for the vehicle and requested that Trooper Raimondi stop and detain the vehicle until Investigator DiPasquale could obtain the search warrant. *Id*. at p.4.

At 12:32 p.m. on November 19, 2009, Trooper Raimondi initiated a traffic stop of the defendant, his vehicle and the trailer. *Id*. Thereafter, Trooper Raimondi issued the defendant a traffic citation for a violation of the New York State Vehicle and Traffic Law Section 402(1)(b), which provides in part, "numbered plates shall be kept clean and in a condition so as to be easily readable and shall not be covered by any glass or any plastic material . . ." N.Y. Veh. & Traf. Law § 402(1)(b) (McKinney 2010).

In support of his motion to suppress, the defendant maintains that Officer Raimondi should have known that the defendant was not a resident of New York State and therefore, Michigan law concerning trailer license plates applies to the defendant, not New York State law. Dkt. #11, pp.8-10. Moreover, the defendant further claims that Trooper Raimondi "made no effort whatsoever to verify the proper registration of

the trailer with the Michigan authorities and that his continued attempts to try to access that information was done to stall and prolong the detention to obtain a warrant."  Dkt. #13, p.2.

In response to the defendant's assertion that Trooper Raimondi should have known that the defendant was a non-resident of New York State and therefore, exempt from New York State's Vehicle and Traffic laws relating to trailer license plates, the government states,

> [t]he difficulty with the defendant's proposition is, that it was impossible for Trooper Raimondi to determine the residency of the defendant during the twenty to twenty-five minutes defendant was detained prior to Investigator DiPasquale obtaining the search warrant for the van and the trailer.  The defendant may very well have shown Trooper [Raimondi] a driver's license from the State of Michigan.  However, the defendant was driving his van, bearing New York registration EVN2005, and registered to the defendant at what purported to be the residence of the defendant, 5889 Ward Road, Apt. 2, Sanborn, New York.  The fact that the defendant's New York registered vehicle was pulling a trailer that happened to have Michigan plates on it, one of which was partially obscured and that the defendant proffered a Michigan driver's license, is hardly conclusive evidence that the defendant was in fact not a resident of New York State.

Dkt. #12, pp.9-10.

In *United States v. Stewart*, the Second Circuit recently stated,

> [w]e have held repeatedly that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment. In *United States v. Jenkins*, for example, we perceived "no error in the District Court's determination that the initial basis for the stop of the SUV was valid because the officers reasonably believed that the

SUV lacked license plates, which would have been a
violation of VTL § 402(1)(a)." 452 F.3d at 212; *see also id.*
("[B]ecause the officers had a reasonable but mistaken
belief that the SUV lacked license plates, stopping the
vehicle was 'justified at its inception.' " (quoting *Terry v.
Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968))). Similarly, in *Holeman v. City of New London*, we
explained that "[t]he Fourth Amendment requires that an
officer making [a traffic] stop have probable cause or
*reasonable suspicion* that the person stopped has
committed a *traffic violation* or is otherwise engaged in or
about to be engaged in criminal activity." 425 F.3d 184, 189
(2d Cir.2005) (emphasis added). . . . **we note that a
mistake of fact does not undermine the existence of
reasonable suspicion**. *See Jenkins*, 452 F.3d at 212 ("The
constitutional validity of a stop is not undermined simply
because the officers who made the stop were mistaken
about relevant facts.")

*United States v. Stewart*, 551 F.3d 187, 191 and 193 (2d Cir. 2009) (emphasis added).


Here, assuming *arguendo* that Trooper Raimondi was mistaken about the

state of defendant's residence and by virtue of that mistake of fact, erred in applying

New York law with respect to the trailer license plate, such mistake of fact does not, as

the Second Circuit explained in *Stewart,* undermine the constitutional validity of the

vehicle and traffic stop.  Accordingly, it is recommended that defendant's motion to

suppress evidence because the stop of defendant's vehicle was improper be denied.


**The Initial Detention of the Defendant**

In his motion to suppress, the defendant argues that his detention was

excessive and unduly intrusive and as such, probable cause was required to justify the

seizure.  Dkt. #11, pp.10-11.  In support of this argument, the defendant claims that the records reflect that,

> he was pulled over at approximately 12:42 p.m., issued a ticket, and forced to remain locked in the police car at the side of the road for an extended period of time, during which time he offered to leave his trailer for the officers' inspection. He was brought to the police station and held even longer until he was formally arrested at 3:45 p.m.  This constitutes an excessively long and unduly intrusive detention which was not supported by probable cause.

*Id*. at p.11. The Court notes that contrary to defendant's argument, the records reflect that the defendant was pulled over at 12:32 p.m., not 12:42 p.m.  *See* Dkt. #11-2, p.11. Moreover, in order to reach the conclusion that the period of detention was excessively long and unduly intrusive, it appears that the defendant is considering the entire time the defendant was detained as one event, rather than separate events.

In its opposition to the defendant's motion to suppress, the government separates the defendant's detention into two separate events for purposes of considering whether the detention was excessively long and unduly intrusive.  Dkt. #12, pp.10-11.  First, the government considers the detention of the defendant from the time Trooper Raimondi pulled the defendant's vehicle over until the time Investigator DiPasquale obtained the search warrant for the defendant's van and trailer.  The government estimates that that period of detention lasted approximately twenty to twenty-five minutes

.

The government next argues that once the search warrant was obtained, at approximately 12:50 p.m., the officers had sufficient probable cause to continue to detain the defendant and to search the van and the trailer. *Id*. at pp.10-11. The Supreme Court of the United States has concluded that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (footnote omitted).

Notwithstanding the defendant's wholly unsupported, conclusory assertion that the search of the defendant's van and trailer may have commenced prior to the search warrant being issued by Judge Gee, the government has unequivocally stated that the officers waited for the search warrant to be issued before commencing the search of the van and the trailer. Thus, absent additional information, the Court must conclude that the search of the van and the trailer commenced sometime after the search warrant was issued at approximately 12:50 p.m. As discussed above, after Investigator DiPasquale transported the Concerned Citizen back to his/her residence, Investigator DiPasquale arrived at the scene and with other law enforcement officers, began the search of the van and the trailer. Dkt. #12, p.5. At approximately 3:00 p.m., Investigator DiPasquale questioned the defendant, who, at that time was not under arrest, but rather was being "detained" pending the search of the vehicle. *Id*. The search of the defendant's van and trailer resulted in the discovery of the firearms and ammunition that are the subject of the instant Indictment. Thereafter, at approximately 3:45 p.m., Investigator DiPasquale again questioned the defendant and placed the

defendant under arrest. It is the government's position and this Court agrees that the approximate two hour and forty-five minute detention of the defendant while the officers executed the search warrant for defendant's van and trailer was neither excessive, unduly intrusive nor legally improper. Accordingly, it is recommended that defendant's motion to suppress evidence based on an excessive and unduly burdensome detention of the defendant be denied.

**The Search Warrant**

The defendant next argues that the search warrant was not supported by probable cause and is therefore invalid and on that basis, the evidence seized must be suppressed. Dkt. #11, pp.11-13. In support of his argument, the defendant asserts that the information supplied by the Concerned Citizen was not corroborated in "material respects" by independent evidence. Specifically, the defendant states, "[s]ignificantly, there were no controlled purchases, or attempt [sic] to purchase, any guns that would corroborate the 'concerned citizen's' allegations. The only corroboration that was done was of innocent information that could be said of anyone." Dkt. #11, p.12. Moreover, the defendant further argues that the failure of the officers to act for a full seven weeks[2] "while having essentially the same information it did within 9 days of the first contact with 'concerned citizen' speaks volumes as to their view of their informant's credibility." *Id*. Accordingly, the defendant requests a hearing to determine

---

[2] The Court notes that the version of the defendant's motion to suppress electronically filed with the Court states "seven months," however, defendant's counsel advised both the Court and counsel for the government that the use of the word "month" was an error and that it should read "7 weeks." See Dkt. #11, p.12.

the reliability of the informant and whether any of the informant's information was corroborated beyond that which is alleged in the search warrant application. *Id*.

In its opposition, the government maintains that the facts alleged in the search warrant application, including specific instances of the investigation conducted by Investigator DiPasquale, are sufficient probable cause to justify the issuance of the search warrant. Dkt. #12, p.12. Moreover, the government adds that the Concerned Citizen that was the source of much of the information set forth in the search warrant application and affidavit, appeared with Investigator DiPasquale before Judge Gee. *Id*. This Court's *in camera* review of Judge Gee's handwritten notes reveals that consistent with the government's position, the Concerned Citizen did indeed appear before Judge Gee and was questioned and interviewed by Judge Gee.[3]

The Court further notes that in its opposition to the defendant's motion to suppress, the government concedes "that the search warrant application contains no indication that Judge Gee obtained any information from the CC [Concerned Citizen], in reliance upon which he issued the search warrant." Dkt. #12, p.13. In his opposition to the government's motion seeking an Order precluding the disclosure of Judge Gee's notes to the defendant (Dkt. #19), the defendant maintains that the failure of the search warrant application to incorporate by reference any testimony provided by the

─────────────────────

[3] The Court notes that alternatively the defendant requested that the Court conduct an *in camera* review of any notes taken by or sworn testimony given before Judge Gee in support of the search warrant application, which this Court has done.

Concerned Citizen means that such information and/or testimony supplied by the Concerned Citizen is not part of the search warrant application. The question of incorporation by reference of the information supplied by the Concerned Citizen in person to Judge Gee was addressed during oral argument on the government's motion for non-disclosure of Judge Gee's handwritten notes and this Court found that although not specifically incorporated by reference, the repeated references to the Concerned Citizen in the affidavit submitted in support of the search warrant application was sufficient.

Section 690.40 of New York's Criminal Procedure Law provides that,

In determining an application for a search warrant, the court may examine, under oath, any person whom it believes may possess pertinent information. Any such examination must be either recorded or summarized on the record by the court.

The purpose of the requirement that the testimony procured orally be recorded or summarized is to ensure the regularity of the application process and to preserve for review the grounds upon which the search warrant is issued. *People v. Taylor*, 73 N.Y.2d 683, 689 (1989). Where evidence secured from a state search warrant is employed in a federal prosecution, however, review of the warrant is concerned solely with the requirements of the Fourth Amendment. *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993); *see Preston v. United States*, 376 U.S. 364 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal

trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers.").

As the Court of Appeals for the Second Circuit stated:

A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden.  "[W]here [the] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. . . .  [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).  In particular, where the officer requesting the search warrant relies on an informant, the magistrate's role is to examine the totality of the circumstances and to

> make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.  *Illinois v. Gates,* 462 U.S. 213, 238-39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see United States v. Feliz-Cordero*, 859 F.2d 250, 252-53 (2d Cir. 1988).

In determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be current, *i.e.,* true at the time of the application, or whether instead it has become stale.

> [T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law. Where the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant. *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981), *cert. denied*, 458 U.S. 1110 (1982).

*Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).


      I have carefully reviewed the search warrant affidavit of Investigator DiPasquale sworn to on November 19, 2009 before Judge Gee. Dkt. #11-2, pp.13-15. Investigator DiPasquale's affidavit recites the investigation conducted in this case, including what information was supplied by a Concerned Citizen and what other investigative measures were undertaken to corroborate the information supplied by a Concerned Citizen. Specifically, paragraph 2 of Investigator DiPasquale's affidavit states,

> On September 21st, 2009 a concerned citizen reported that someone they knew as Michael, who the citizen stated was a white male in his 50's [sic] and the owner/operator of a White Dodge Conversion van bearing New York State registration plates EVN2005 was offering for sale two handguns. This concerned citizen also states that Michael was living and sleeping out of this Conversion Van behind 5889 Ward Rd. Apt. #2 in Sanborn N.Y. and that this apartment was being rented by a Ben Askey. 5889 Ward Road is located in the Town of Lewiston.

Dkt. #11-2, p.14. Investigator DiPasquale further stated in his affidavit in paragraph 3, that on that same day, he confirmed that the vehicle bearing New York State registration EVN 2005 is registered to a Michael W. Finch, D.O.B. 10/17/51, address of 5889 Ward Rd. A2 Sanborn N.Y. 14132 and that the vehicle has a VIN of 2B6HB21Y2LK781883 and is listed as a 1990 Dodge White Suburban. *Id*. In addition, the following day, September 22, 2009, Investigator DiPasquale learned that Michael W. Finch did not possess a New York State pistol permit in any county in the State of New York. *Id*.

> Paragraph 6 of Investigator DiPasquale's affidavit provides,
>
> On September 30, 2009, your affiant further interviewed a concerned citizen on the information that Michael W. Finch was attempting to sell illegally possessed handguns. The concerned citizen stated that they had previously observed two handguns that they described as being a .45 Caliber revolver and a .45 Caliber semi-automatic pistol. The concerned citizen also stated that Michael Finch stated today that he sold one of the .45 Caliber handguns.

Dkt. #11-2, p.14. Moreover, paragraph 7 of Investigator DiPasquale's affidavit further states that on November 19, 2009, the Concerned Citizen further advised Investigator DiPasquale that Michael Finch was preparing to leave New York to travel to South Carolina but was still interested in selling some of his handguns. *Id*. In addition,

> [t]he concerned citizen stated that on November 16th, 2009, Michael Finch displayed to them the handguns that were located and kept in his 1998 Dodge Conversion Van. The concerned citizen was able to describe the handguns as being a .45 Caliber revolver with a black finish, a .45 Caliber semi-automatic pistol with a silver finish, and a newer .22 Caliber revolver with a black finish still kept in the box. The

-20-

> concerned citizen stated that all of these handguns are kept
> inside Michael Finch's Conversion Van and that this car is
> currently parked at 5889 Ward Rd. in Sanborn. N.Y.

*Id*. These allegations of Investigator DiPasquale regarding the defendant were not evaluated in an isolated fashion but were considered in the context of the totality of the circumstances, as set forth in the entire affidavit sworn to on November 19, 2009. The totality of the circumstances clearly established "a fair probability that contraband or evidence of a crime [would] be found" within the defendant's van. Because the defendant has failed to meet his "heavy burden" in establishing a lack of probable cause for such warrant, it is hereby recommended that defendant's motion to suppress such evidence and defendant's request for a hearing be denied.

**Defendant's Statements**

As a threshold matter, the Court notes that from the face of the defendant's motion it is unclear as to whether he is seeking to suppress <u>all</u> of his statements made to law enforcement between approximately 12:32 p.m. and approximately 3:45 p.m. on November 19, 2009. However, based on statements made by counsel for the defendant during oral argument, this Court will treat defendant's motion as one to suppress <u>all</u> statements.

### Statements to Trooper Raimondi

In his motion, the defendant argues that the statements he made at the scene, while locked in the back of the patrol car, "I have three guns and five knifes [sic]. They are all legal. You can search the trailer, but I [sic] rather you not search my van.

That is like my house.  I have nothing to hide.  I told you everything is legal." should be suppressed.  In support of his motion to suppress, the defendant surmises that at the time the statements were made, the officers were trying to get the defendant to consent to a search of his van.  The defendant claims that "he repeated the same statement hours later without being free from custodial restraint and without Miranda warnings." As is evident from the excerpts below and as will be discussed below, the defendant's subsequent statements to Investigator DiPasquale were not, contrary to the defendant's assertion, the same statements he made to Trooper Raimondi.  Rather, in his first statement to Investigator DiPasquale, the defendant denies possessing any guns.

In support of his motion to suppress, counsel for the defendant states, "[u]pon information and belief, at the time the statements were made, the officers were trying to get Finch to consent to a search of his van and therefore their questions were a deliberate attempt to provoke incriminating responses."  Dkt. #11, p. 14.  An argument supported by "[a]iry generalities, conclusory assertions" and inadmissable evidence is insufficient to create a genuine issue of fact necessitating an evidentiary hearing. *United States v Aiello*, 814 F.2d 109, 113-14 (2d Cir.1987); *United States. v. Solano*, 300 Fed. Appx. 83 (2d Cir. 2008).  Notably, the defendant does not submit an affidavit in support of his motion to suppress the statements he made to Trooper Raimondi. Accordingly, this Court concludes that the defendant's statements to Trooper Raimondi were spontaneous and not in response to law enforcement interrogation.  On this basis alone, it is recommended that defendant's motion to suppress his statements to Trooper Raimondi be denied.

**Statements to Investigator DiPasquale**

With respect to statements made by the defendant to Investigator DiPasquale, the government concedes that the defendant's statements were made in response to questions asked by Investigator DiPasquale at a time when the defendant although not yet formally arrested, was in custody[4] and certainly not free to leave. The government believes those statements are admissible by reason of the defendant's subsequent waiver of his *Miranda* warnings. Specifically, the statements made to Investigator DiPasquale were,

> Question: How come your Michigan driver's license has the wrong date of birth?
>
> Answer: Like I told the officer, there was some kind of mistake and when I brought it to their attention, they told me not to worry about it.
>
> Question: What is your real date of birth?
>
> Answer: 10/27/51, it's off by ten days, it should be a one and not a two [sic].
>
> Question: Are you going to tell me what kind of guns you have inside the van?
>
> Answer: I never said I had guns. I told him that I have three knives, actually, two bayonets and a knife. You guys are violating my rights. Nobody read me my <u>Miranda</u> or anything.

---

[4] During oral argument, the government disagreed with the Court's use of the phrase "in custody" and continued to state that the defendant was being "detained." As will be discussed in greater detail below, the government's insistence on using the word "detained" rather than "in custody" does not change the legal significance of the events. Regardless of which word/phrase is used, the defendant was not free to leave and for purposes of *Miranda*, was in custody.

Question:  You are not under arrest, however, you are in my custody and since you have brought the matter, up, I will read you your Miranda.

Answer:  Don't bother, I already know them and I waive my rights.  I'm not trying to cause a problem.

Dkt. #12, p.6.


Approximately forty-five minutes later, after several firearms and ammunition were discovered in defendant's van and/or trailer, Investigator DiPasquale again spoke with the defendant as follows:

Question:  Where did you get the .22 revolver from?

Answer:  I got that as a gift from a guy I know from Lake Katheryn Village, Washington.  His name is Jim Scott.  I traded him a dog for it.  Actually, it was a pregnant dog, same as mine.

Question:  Possession of that gun in New York State without a pistol permit is a crime and since you do not have a pistol permit, you are now under arrest.

*Id*. at pp.6-7.  At that time, Investigator DiPasquale placed the defendant under arrest.

*Id*. at p.7.


In *Miranda*, the United States Supreme Court created a procedural mechanism with the purpose of establishing a prophylactic safeguard that would protect a defendant from the coercive nature of custodial interrogation and preserve his Fifth Amendment privilege against self-incrimination.  However, before the requirements of *Miranda* come into play, there must be a form of "custody" of the person to be interrogated which "custody" amounts to the deprivation of "freedom of action in any

significant way." *Miranda v.* Arizona, 384 U.S. 436, 444 (1966); *Thompson v. Keohane*, 516 U.S. 99, 100-101 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004). The defendant bears the burden of proving custody. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984). In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances. *California v. Beheler*, 463 U.S. 1131, 1125 (1983)*; Tankleff v. Senkowski, supra*. "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (Citation omitted). *California v. Beheler* at 1125; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The United States Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'." *California v. Beheler* at 1125; *Mathiason* at 495.

      The Court of Appeals for the Second Circuit has ruled that:

      The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave. An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave. *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks

and citation omitted), *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski,* 135 F.3d 235, 243-244 (2d Cir. 1998).

As the Court of Appeals for the Second Circuit has stated, the Supreme Court's decision in *Berkemer* [*Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)] "emphasizes that 'the only relevant inquiry [in determining when a person is in "custody" for purposes of Miranda] is how a reasonable man in the suspect's position would have understood his situation'." *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001).

Here, with respect to whether the defendant was in custody at the time he made statements to Investigator DiPasquale, the Court finds that, although no formal arrest had been made, the defendant was indeed in custody. There can be no question, the defendant was not free to leave, indeed, the defendant asked permission to leave and that permission was denied. *See Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998). With respect to the question of whether the defendant was subjected to impermissible interrogation by Investigator DiPasquale prior to being given his *Miranda* warnings, the Court will address the defendant's first statements to Investigator DiPasquale in two parts. First, the Court will address the following exchange between Investigator DiPasquale and the defendant:

Question:  How come your Michigan driver's license has the
wrong date of birth?

Answer:  Like I told the officer, there was some kind of
mistake and when I brought it to their attention, they told me
not to worry about it.

Question:  What is your real date of birth?

Answer:  10/27/51, it's off by ten days, it should be a one
and not a two [sic].

The above-cited exchange concerning an apparent error on the defendant's driver's

license and the defendant's correct date of birth are permissible pedigree questions, not

interrogation.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990); *United States

v. Gotchis*, 803 F.2d 74, 79-79 (2d Cir. 1986).  Accordingly, it is recommended that

defendant's motion to suppress the above-cited portion of his first exchange with

Investigator DiPasquale be denied.


The second part of the defendant's first exchange with Investigator

DiPasquale was as follows:

Question:  Are you going to tell me what kind of guns you
have inside the van?

Answer:  I never said I had guns.  I told him that I have three
knives, actually, two bayonets and a knife.  You guys are
violating my rights.  Nobody read me my Miranda or
anything.

Question:  You are not under arrest, however, you are in my
custody and since you have brought the matter, up, I will
read you your Miranda.

Answer:  Don't bother, I already know them and I waive my
rights.  I'm not trying to cause a problem.

Dkt. #12, p.6.  This questioning of the defendant by Investigator DiPasquale was custodial interrogation which by the very nature of the questions, Investigator DiPasquale knew or should have known, were intended to elicit  incriminating evidence from the defendant in violation of his Fifth Amendment rights.  *Rhode Island v. Innis*, 446 U.S. 291 (1980) ("[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").  The government's position is that because the defendant stated that he was aware of his rights and that he waived his rights, his preceding statement to Investigator DiPasquale to the effect that he didn't have any guns is not subject to suppression.  Contrary to the government's position, the defendant's proclaimed knowledge of his rights under *Miranda* and his subsequent waiver of those rights does not operate to insulate such statements from suppression.  The record before this Court is clear, the defendant's statements to Investigator DiPasquale "I never said I had guns.  I told him that I have three knives, actually, two bayonets and a knife.  You guys are violating my rights.  Nobody read me my <u>Miranda</u> or anything." in response to Investigator DiPasquale's question, "Are you going to tell me what kind of guns you have inside the van?" were made <u>prior</u> to the defendant being advised of his *Miranda* warnings and <u>prior</u> to the defendant's waiver of his *Miranda* warnings.  Therefore, it is recommended that the foregoing statements be suppressed.

Finally, the defendant seeks to suppress his second set of statements to Investigator DiPasquale. As described above, at approximately 3:45 p.m., the defendant made the following statements to Investigator DiPasquale,

> Question: Where did you get the .22 revolver from?
>
> Answer: I got that as a gift from a guy I know from Lake Katheryn Village, Washington. His name is Jim Scott. I traded him a dog for it. Actually, it was a pregnant dog, same as mine.
>
> Question: Possession of that gun in New York State without a pistol permit is a crime and since you do not have a pistol permit, you are now under arrest.

Dkt. #12, pp.6-7. Unlike defendant's first statements to Investigator DiPasquale, the above-cited statements by the defendant were made <u>after</u> Investigator DiPasquale attempted to advise the defendant of his rights in accordance with *Miranda* and the defendant told him not to bother since he knew his rights. As a result, the defendant voluntarily waived his rights under the Fifth Amendment. Therefore, there is no legal basis to suppress the defendant's statements. Accordingly, it is recommended that defendant's motion to suppress his second set of statements to Investigator DiPasquale be denied.

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**


DATED:      Buffalo, New York
              July 30, 2010

*s/ H. Kenneth Schroder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**
